## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL STEPHENS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MARY CANINO, MICHAEL TROYAN** | : | |
| **and C.O. JOHN DOE** | : | **NO. 13-5729** |

### <u>MEMORANDUM OPINION</u>

**Savage, J.**                                                    **November 26, 2014**

In this § 1983 civil rights action, the *pro se* plaintiff, Michael Stephens, alleges that the defendants violated his Fourteenth Amendment right to due process by returning him to prison from a halfway house and placing him in disciplinary custody, and conducting a hearing without notice and an opportunity to present and cross-examine witnesses.  He has named as defendants Michael Troyan, the correctional officer who brought the charges against him, and Mary Canino, the prison hearing officer who presided over his hearing.[1]

Stephens claims that Canino and Troyan deprived him of his Fourteenth Amendment right to due process by charging him "with unsupported misconducts, without adequate pre-hearing notice or due process at the hearing and finding him guilty of the charges without sufficient evidence."[2]  He contends that as a result of their actions, he spent an additional seventeen months in prison and was placed in a

---

[1] Stephens also names John Doe, a Pennsylvania Department of Corrections ("DOC") employee at SCI-Graterford.  Compl. ¶ 7 (Doc. No. 3).

[2] Compl. ¶ 39.

restricted housing unit under "conditions atypical of incarceration."[3]

The defendants have moved to dismiss the complaint.  Both defendants argue that Stephens cannot make out a procedural due process claim because he did not have a protected liberty interest.  Essentially, they contend that his placement in disciplinary detention did not constitute atypical and significant hardship implicating a protectable liberty interest, and the state prison regulations did not create a liberty interest.[4]  Canino also argues that Stephens had adequate state remedies which he did not pursue.[5]  Troyan contends that he cannot be liable because he had no involvement or knowledge of any alleged procedural due process violations.[6]

In response, Stephens insists he had a liberty interest.  He contends that he was denied due process when his "pre-parole" status was taken away and he was transferred from a halfway house to a correctional facility without timely notice as prescribed by prison regulations, and without the opportunity to confront the evidence presented against him and to present witnesses on his behalf.[7]  Finally, Stephens argues that the available state remedies were inadequate.[8]

Accepting as true the allegations in his complaint and drawing all reasonable

---

[3] *Id.*  Stephens calculates that he was incarcerated in prison for seventeen months after he was returned from the halfway house to state correctional institutions to serve the balance of his maximum sentence.  In any event, he was released upon the expiration of, not beyond, the sentence imposed.

[4] Canino's Mot. to Dismiss Compl. at 5-8 (Doc. No. 8).

[5] *Id.* at 8–9.

[6] Troyan's Mot. to Dismiss Compl.at 5-8 (Doc. No. 7).

[7] Pl.'s Resp. in Opp'n to Def. Canino's Mot. to Dismiss Compl. (Pl.'s Resp.") at 6-8, 11-14.

[8] *Id.* at 15-17.

inferences in his favor, we conclude that Stephens did not have a constitutionally protected liberty interest of which he was deprived.   Because his tenure in the Restricted Housing Unit ("RHU") did not exceed his maximum sentence and did not constitute an atypical and significant hardship, he had no protectable liberty interest under the due process clause. Nor did the Department of Corrections ("DOC") policy confer a state-created liberty interest.   Therefore, we shall grant the motions to dismiss.[9]

### Facts[10]

According to his complaint, on October 21, 2011, Stephens was taken from a Community Corrections Center ("CCC"), a halfway house, to the State Correctional Institution ("SCI") at Graterford to face a misconduct charge filed by Troyan, the Security Lieutenant at SCI-Laurel Highlands.[11]   Upon his arrival, Stephens was presented with a notice of the charge that he had sent a false letter to SCI-Camp Hill about a planned inmate escape at SCI-Laurel Highlands.[12]   He was then placed in pre-hearing confinement in the RHU.[13]   Four days later, Canino, a hearing officer at SCI-Graterford, dismissed the misconduct charge without prejudice with leave to file another charge.[14]

---

[9] Because Stephens has not made out a due process claim, we do not address the issues of an adequate state remedy and the lack of personal involvement.

[10] When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), all well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiff.  *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).

[11] Compl. ¶¶ 9, 11.

[12] *Id.* ¶ 11.

[13] *Id.* ¶ 12.

[14] *Id.* ¶ 13.

Stephens remained in the RHU for approximately three more weeks until a correctional officer confirmed the dismissal on November 16, 2011.[15]  He was released into the general population the following day.[16]  The next day, on November 18, 2011, Stephens was escorted back to Canino's office for a hearing on two misconduct charges.  One alleged the same misconduct that was the subject of the charge that had been dismissed, the letter sent to SCI-Camp Hill about a planned inmate escape.  The other charged him with sending a letter containing white powder to the Pennsylvania Board of Probation and Parole.[17]  Canino found Stephens guilty of both misconduct charges and sentenced him to 360 days in the RHU.[18]  After serving his time, he was placed in administrative segregation for several days before being transferred back to SCI-Laurel Highlands in February 2012, where he remained until his release in March 2013, upon the expiration of his maximum sentence.[19]

## Analysis

The dispositive issue is whether Stephens has sufficiently alleged facts that, if proven, could establish that he had a liberty interest protected by the Fourteenth

---

[15] *Id.* ¶¶ 14-18.

[16] *Id.* ¶¶ 18-19.

[17] *Id.* ¶¶ 20, 22-26.

[18] *Id.* ¶ 29.

[19] The plaintiff's complaint does not state the exact dates of his transfer or his release. *See* Compl. ¶¶ 35-36.  Although not necessary to the disposition of the motions, we note that Stephens elected to serve his maximum sentence and declined to apply for parole.  According to the Notice of Board Decision issued by the Board of Probation and Parole, Stephens made a "written request to serve [his] max."  The Board acceded to his request, which it characterized as his "negative interest in parole," and ordered Stephens to serve until March 21, 2013, his maximum.  *See* Troyan's Mot. to Dismiss, Ex. A.

Amendment.  If he did not, he cannot make out a due process claim.

The due process analysis starts with determining whether the liberty interest asserted is one that is protected by the Fourteenth Amendment.  *Montanez v. Sec'y Dep't of Corr.*, 2014 WL 5155040, at *6, __ F.3d __ (3d Cir. Aug. 15, 2014) (quoting *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 663 (3d Cir. 2011)).  If it is a protected interest, we must then determine what process is necessary to protect it.  *Newman v. Beard,* 617 F.3d 775, 783 (3d Cir. 2010) (citation omitted).  If the interest is not protected, no process is necessary.  Thus, at the threshold, Stephens must establish that he had a protected liberty interest that triggered due process rights. *See Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002) (finding that succeeding on a due process claim requires demonstrating that the plaintiff was deprived of a liberty interest).

Prisoners do not enjoy the same liberty interests as ordinary citizens do.  *See Sandin v. Conner*, 515 U.S. 472, 485 (1995).  Their incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Id.* (quoting *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)).  Yet, prisoners do not leave all of their constitutional rights at the prison gate.  *See Sandin*, 515 U.S. at 485; *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).

A protected liberty interest is either inherent in the Due Process Clause or created by state law or regulations.  *Asquith v. Dep't of Corr.*, 186 F.3d 407, 409 (3d Cir. 1986) (citing *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)).

The Due Process Clause does not afford Stephens a protected liberty interest

because he was not imprisoned beyond his maximum sentence.  If an inmate is not confined beyond the sentence imposed and the sentence is typically administered, the Due Process Clause does not confer a liberty interest in freedom.  *Sandin,* 515 U.S. at 480.  The Due Process Clause does not guarantee a prisoner's placement in any particular prison during the term of imprisonment imposed.  *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see Fraise*, 283 F.3d at 522*.*  Nor does it protect a prisoner against a transfer from one institution to another.   *Meachum,* 427 U.S. at 225.

An inmate's transfer from a halfway house back to prison falls "within the normal limits or range of custody which the conviction has authorized the state to impose."  It does not confer a liberty interest.  *Meachum*, 427 U.S. at 225.  Thus, it does not implicate due process protections under the Due Process Clause.  *Asquith,* 186 F.3d at 410-12.

In *Asquith*, the Third Circuit held that a person serving his sentence in a halfway house did not have a liberty interest in remaining at the halfway house under the Due Process Clause because he never left institutional confinement.  *Id.* at 411.  *See also Brennan v. Cunningham*, 813 F.2d 1, 5 (1st Cir. 1987) ("An inmate in a halfway house . . . . enjoys some significant liberty, [but] he remains under confinement in a correctional institution.").  Although appellant could leave at certain times for work or to visit family, he still lived in a strictly monitored building where he was subject to curfew and other restrictions.  The Third Circuit held that because he was still in confinement, Asquith's transfer to a more restrictive confinement did not trigger due process protections under the Due Process Clause.  *Id.*

Although life in a halfway house is less restrictive than within the prison, the prisoner remains in state custody subject to restraints on his freedom. In other words, placement in a halfway house is still confinement. Transferring the inmate from a halfway house to prison is a permissible transfer from one facility to another in the prison system. Thus, placement in a halfway house does not give rise to a protected liberty interest. *See Meacham*, 427 U.S. at 225.

Though Stephens was afforded more freedom at the CCC than in prison, his tenure there still constituted institutional confinement.[20] *See Asquith*, 186 F.3d at 410-11; *Brennan*, 813 F.2d at 5. Stephens' transfer from a halfway house back to a correctional facility did not implicate due process protection. *See Meachum*, 427 U.S. at 225 (holding that liberty interests are not implicated when an inmate is transferred from one institution to another with less favorable conditions).

Neither did Stephens' confinement in disciplinary custody deprive him of a protected liberty interest. Because the time he spent in the RHU did not exceed his maximum sentence, there was no violation under the Due Process Clause. In his complaint, Stephens asserts he "experienced approximately seventeen months additional incarceration."[21] He spent approximately 360 days in the RHU.[22] Upon completion of his disciplinary detention, he was returned to the general prison

---

[20] Stephens does not allege that he was able to travel freely without any restriction. In fact, those housed in a CCC must have a specific reason for leaving and sign out and return at a specific time. Residents are also subject to misconduct notices and can face return to prison. John E. Wetzel, *What is a Community Corrections Center?*, 69 The PAPPC Journal, 1, 6 (2012), *available at* http://www.pappc.org/docs/Feb%202012%20Journal%20FINAL2%20lo%20res.pdf.

[21] Compl. ¶ 37.

[22] Compl. ¶ 33.

population to serve the remainder of his sentence.[23]  He does not allege that he was confined beyond his maximum sentence date.[24]

State-created liberty interests are limited to situations where the prison's action "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484.  In *Sandin*, the Court held that an inmate sentenced to thirty days in disciplinary confinement did not endure atypical and significant hardship.  *Id.* at 486; *see also Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 171 (3d Cir. 2011) (citing *Sandin*, 515 U.S. at 483-84) (holding that inmates in disciplinary hearings are not entitled to procedural due process because the resulting sanctions do not affect a protected liberty interest);[25] *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) (holding that a prisoner's placement in administrative custody for fifteen months did not impose an atypical and significant hardship, implicating due process protections).[26]

Because Stephens' confinement in disciplinary custody did not amount to atypical or significant hardship, there was no violation of any state-created liberty interest.

---

[23] *See* Troyan Mot. to Dismiss at 5 n.2, and note 3, *supra*.

[24] *See* Compl. ¶¶ 35-36.

[25] *See also Thomas v. Rosemeyer*, 199 F. App'x 195 (3d Cir. 2006).  In *Rosemeyer*, the inmate alleged a violation of his Fourteenth Amendment right to procedural due process when he was taken from SCI-Somerset and placed in the RHU for 270 days without being able to call witnesses or see the evidence against him during his misconduct hearing.  *Id.* at 197.  The court, citing *Sandin* and *Griffin*, held that this disciplinary confinement did not constitute atypical and significant hardship.  *Id.*  The court further held that the existence of state procedures did not confer a liberty interest.  *Id.* at 197-98.  Therefore, the inmate's Fourteenth Amendment claims failed.  *Id.* at 198.

[26] Though administrative custody is not, on its face, the same as disciplinary custody, the analysis is the same.  *Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003).

*Sandin,* 515 U.S. at 484 (holding that, in order to have a state-created liberty interest, there must be atypical and significant hardship in relation to the ordinary incidents of prison life).  Even though one may consider one year in disciplinary confinement a substantial amount of time, it is not an atypical or significant hardship.  112 F.3d at 708 (finding that placement in administrative custody for fifteen months did not constitute atypical or significant hardship).  Placement in disciplinary confinement is not uncommon.  Nor has there been any inference or allegation that the conditions of his disciplinary confinement were any different than those imposed upon other prisoners who have been disciplined for similar conduct.  Thus, Stephens' tenure in disciplinary detention did not create a liberty interest.

Nor does Stephens' assertion that Canino and Troyan's failures to comply with DOC policy DC-ADM 801 constitute a deprivation of due process.[27]  The regulation does not confer a state-created liberty interest.  *See Griffin*, 112 F.3d at 708 (stating that a state statute or regulation conferring a right was not enough to trigger due process protection).

The mere existence of state procedures or regulations does not create a protectable liberty interest.  As recognized in *Griffin*, "a state statute or regulation conferring a right is not alone enough to trigger due process."  112 F.3d at 708.  Therefore, the fact that a state has established procedures does not necessarily mean it

---

[27] *See* Pl.'s Resp. at 13-14.  DOC policy DC-ADM 801, Section VI, specifically states that it "does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual."   DC-ADM 801, at 2, *available at* https://www.portal.state.pa. us/portal/server.pt/document/916568/801 _inmate_ discipline pdf3.

has created a liberty interest.  *See id.* (citing *Sandin*, 515 U.S. at 484).[28]

## Conclusion

Stephens was not entitled to due process protection because his confinement and treatment did not give rise to a protected liberty interest.  His placement in disciplinary detention, his removal from a halfway house, and the correctional facility's failure to comply with a prison regulation did not create one.  Therefore, because he has failed to state a cause of action for a deprivation of a protected liberty interest, we shall grant the motions to dismiss the complaint.[29]

---

[28] *See also Larry Jenkins v. Murray,* Civ. A. No. 08-01034, 2008 WL 3832638, at *2 (E.D. Pa. Aug. 13, 2008) (holding that a failure to follow a DOC Administrative Directive did not implicate due process protections because state procedures alone did not create a liberty interest).

[29] It appears that Stephens cannot add anything to overcome the absence of a protected liberty interest.  Nevertheless, we shall grant him leave to amend his complaint.